# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CRIMINAL CASE NO: 3:09-CR-17-MR-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| TADARIAN RESHAWN NEAL, ) | |
| ) | |

**THIS MATTER** is before the Court upon the "Motion and Memorandum in Support of Motion to Exclude Alleged Defendant's Statements" (Document No. 37) filed, through counsel, by Tadarian Reshawn Neal ("Defendant") on September 27, 2009. The United States opposes the motion. (Document No. 48). An evidentiary hearing was held on December 15, 2009, with the Defendant personally present with counsel.[1] One witness testified at the hearing. Having fully considered the motion and response, as well as the testimony, evidence, and the arguments of counsel, the undersigned recommends that the motion be **denied**, based upon the following proposed findings of fact and conclusions of law:

## I. Issue Before the Court

Defendant contends he was subjected to custodial interrogation without a Miranda warning in violation of the Fifth Amendment and asserts that his statements should therefore be suppressed. The United States responds that the Defendant voluntarily agreed to speak with officers and was not under arrest or otherwise in custody when he made the statements at issue, and that suppression is

---

[1] Any delay in scheduling this hearing was largely due to Defendant's recent demands for another change of appointed counsel. Defendant is now represented by his fourth counsel.

not warranted. The relevant inquiry for the Court is whether the Defendant was "in custody" when he made the statements at issue.

## II. Finding of Facts

The following facts are taken from the parties' briefs and the evidence at the hearing. On August 15, 2008, CMPD Officer William Clark and CMPD Detective Michael Davis responded to a "possible domestic violence call" involving a shooting at 1120 North Wendover Road, Apt. B, Charlotte North Carolina, at approximately 10: 23 a.m. The victim, Tishean Reid ("Reid"), survived but suffered severe injuries to her left arm and shoulder and the loss of her left breast. Defendant Tadarian Neal ("Neal"), a convicted felon,[2] was living with Reid (his girlfriend) and her two sons (T.W. and D.W.).[3]

While Officer Clark was talking with Reid's teenaged son (T.W.) at the scene, Detective Davis approached Neal, who was sitting on the front steps of the apartment. He asked Neal if he could ask him some questions and Neal agreed. When asked about the incident, Neal indicated he had gone to the store (Sam's Mart) and that when he returned about fifteen minutes later, he found that Reid had been shot and wounded. Neal denied hearing any gunshot and denied shooting Reid, but suggested that a person named "T" may have shot her. Neal agreed to allow a gunshot residue test on his hand. Detective Davis asked Neal if he would be willing to go to the police station with him to give a recorded statement about these events. Defendant agreed to do so. At about 11:45 AM,

---

[2]Defendant, through counsel, orally stipulated at the hearing that he was a convicted felon and indicated he would be filing a written stipulation.

[3]Reid's son, D.W., is severely disabled and unable to speak.

Detective Davis drove Neal to the police station. Neal was in the backseat, without handcuffs or any other type of restraint.

Upon their arrival at the police station, Neal took a seat in Interview Room 2005 on the second floor where the recording equipment was located. Detective Davis sat across the table from Neal. The interview was both audio and video recorded, and the United States has entered a transcript of the interview into evidence. See Gov. Hearing Ex. 1. Before asking Defendant for his statement of events, the transcript reflects the following exchange:

> Det. Davis: Okay. This interview is being conducted in Room 2005, uh Mr. Neal came down to the station voluntarily. Mr. Neal, you realize you're not under arrest, okay. Do you understand that?
> Neal: Yes sir.
> Det. Davis: You realize that you're free to leave at any time. Do you understand that?
> Neal: Yes sir.
> Det. Davis: You don't have to answer any of my questions, do you know that?
> Neal: Yes sir.
> Det. Davis: Alright, do you need anything right now?
> Neal: Um, no sir. I just got everything I needed.
> Det. Davis: You got to use the bathroom, get a drink of water a minute ago. Is that correct?
> Neal: Yes sir.

Gov. Hearing Ex. 1, p. 3. Detective Davis then asked Neal "what happened."[4] Neal repeated the version of events he had told Detective Davis at the scene, essentially that he had gone to the Sam's Mart and that when he returned after fifteen minutes, he found Reid shot and wounded. Neal claimed that Reid earlier had a shotgun and several handguns, but had sold the shotgun last year. Neal indicated his fingerprints might be on the shells because he had shot the gun approximately one

---

[4]Neal did not actually confess to shooting Reid. His statements are at issue because, as the United States asserted at the hearing, Neal made various false statements that may show consciousness of guilt.

year ago. Gov. Hearing Ex. 1, pp. 14-15. Neal also indicated that he had shot a .9 mm handgun the night before. *Id*. at 16. Neal denied arguing with Reid that day. *Id*. at 20-21.

During the interview, Detective Davis stepped out to speak with Officer Clark, who advised him about the information he had learned from T.W. *Id*. at 22. Officer Clark advised that, according to T.W., Neal had became angry that morning, had thrown things around the apartment, and had retrieved a sawed-off shotgun from the bedroom. T.W. saw Neal put a bullet into the gun, cock the gun, and point it at his mother. T.W. ran out of the apartment and then heard a "boom" inside. When T.W. returned, he saw his mother lying in a pool of blood. Neal told T.W. the shooting was an accident, gave the gun to T.W., and asked T.W. to hide it up the street. T.W. hid it outside. T.W., Neal, Reid, and D.W. were the only persons inside the apartment at the time of the shooting. T.W. later took investigating officers to the hidden gun, and Reid confirmed the information T.W. had given investigators, namely, that Neal had shot her.

Detective Davis continued his interview with Defendant, but did not indicate that anything had changed regarding Neal's ability to leave or not answer questions. When Neal told him he had served ten years in prison, Detective Davis asked "what for?" Neal declined to say, and Detective Davis did not press him for an answer. *Id*. at 27-28. They continued to talk, and the total interview lasted only 52 minutes. Defendant was subsequently arrested and indicted.

### III. Conclusions of Law

The Fifth Amendment to the United States Constitution guarantees that "No person shall be...compelled in any criminal case to be a witness against himself..." U.S. Constitution, amend. V. To safeguard such right, officers must inform a suspect in custody of his right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to retain

counsel or have counsel appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (reaffirming *Miranda*); *Texas v. Cobb*, 532 U.S. 162, 171-72 (2001). Statements obtained from a suspect during custodial interrogation without a proper *Miranda* warning are generally inadmissible. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). Custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.

"Absent formal arrest, Miranda warnings only apply where there has been such a restriction on a person's freedom as to render him 'in custody.' " *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). A person is "in custody" for *Miranda* purposes when formally arrested or when, under the totality of the circumstances, the individual's "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984). The question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his situation" to be one of custody. *Id*. at 422; see also, *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007).

In the present case, it is undisputed that all the statements at issue occurred *before* the Defendant was formally arrested. As to whether Defendant was ever constrained to a degree tantamount to formal arrest, the evidence does not so indicate. Neal agreed at his apartment to voluntarily accompany Detective Davis to the station and speak with him there. Upon arriving at the police station, Defendant was seated in an interview room and was expressly advised that he was *not* under arrest, that he was *free to leave* at any time, and that he did *not* have to answer any questions. *See Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985) ("informing a suspect that he is not

under arrest is one factor frequently considered to show lack of custody"). The transcript of the interview shows that Defendant was proceeding willingly and voluntarily.

The Defendant was not handcuffed or physically constrained in any way at any relevant time. The circumstances at the police station were straightforward and businesslike. The conversation at the station was calm and conducted without any yelling, bullying, or intimidation. Neal was able to leave the room to get a drink of water and use the bathroom. He was not physically threatened or otherwise coerced into making any statements. The interview was relatively brief - only 52 minutes – and was conducted during daytime hours. The circumstances surrounding the interview simply do not reflect the kind of coercion or pressure that might impermissibly overcome an individual's will. *Berkemer,* 468 U.S. at 428.

Although Defendant points out that he had no means to leave the station (see Document No. 37, p. 5), he was nonetheless free to end the conversation and exit the station. These facts are a far cry from situations where circumstances tantamount to arrest have been found. *See, e.g, Colonna*, 511 F.3d at 433 (finding circumstances amounted to custody where 24 law enforcement officers executed a search warrant at a suspect's home at 6:29 a.m., awaking him by kicking open his bedroom door and ordering him to dress at gun point and come downstairs for questioning).

Viewed objectively, the evidence indicates that a reasonable man in Neal's position would not have believed that he was "in custody" at any point during the interview. Toward the end of the interview, Neal stated "[a]nd then when I did this, came down here with you, I knew this shit right here was gonna happen" *(Id*. at 45); and he later said, "I don't know why I came down here with you ...it was lose/lose situation...man...take me across the street." *(Id*. at 53). Contrary to Defendant's

contention that these comments show that he was not free to leave, these comments tend to confirm that Neal voluntarily agreed to make a recorded statement and later regretted it, essentially saying "arrest me now." This does not render the prior statements involuntary.

Considering all the circumstances, it is quite apparent that the detective did not question Neal against his will. Rather, the Defendant sought to voluntarily tell officers his version of events. The United States points out that the Defendant, a convicted felon, is quite familiar with his *Miranda* rights, and even indicated in his interview that "he knew the routine." (Document No. 48, p. 3, citing Gov. Hearing Ex. 1, p. 20). Defendant was not under arrest or "in custody" at any time during his voluntary interview. His statements need not be suppressed.

### IV. Conclusion

The Defendant has not shown any constitutional violation that would require exclusion of any of his statements made to Detective Davis prior to Defendant's arrest.

**IT IS THEREFORE RECOMMENDED** that the "Motion and Memorandum in Support of Motion to Exclude Alleged Defendant's Statements" (Document No. 37) by the Defendant should be **DENIED**.

### V. Notice of Appeal Rights

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions law and the recommendations contained in this memorandum must be filed within ten (10) days after service of same. *Snyder v. Ridenour*, 889 F.2d 1363, 1365 (4th Cir.1989); *United States v. Rice*, 741 F.Supp. 101, 102 (W.D.N.C.1990). Failure to file objections to this memorandum with the District Court constitutes a waiver of the right to *de*

*novo* review by the District Court, *Snyder,* 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841, 845-46 (4th Cir.1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.1984).

Signed: December 17, 2009

David C. Keesler
United States Magistrate Judge